MAURICE STOKES,                  )
            **Plaintiff,**      )  **C.A. No. 14-60 Erie**
                        )
        **v.**             )
                        )  **Magistrate Judge Baxter**
CAPTAIN RISKUS, et al.,        )
            **Defendants.**    )
                        )

## OPINION AND ORDER[1]

United States Magistrate Judge Susan Paradise Baxter

## I.    INTRODUCTION

Plaintiff Maurice Stokes, a prisoner formerly incarcerated at the State Correctional Institution at Forest in Marienville, Pennsylvania ("SCI Forest"), brings this action pursuant to 42 U.S.C. § 1983 against Captain Riskus ("Riskus"), Lieutenant Settnek ("Settnek"), Lieutenant Hidalgo ("Hidalgo"), and Sergeant Freeman ("Freeman"), all of whom are corrections officers at SCI-Forest; Michael Overmyer ("Overmyer"), the Superintendent of SCI-Forest who, during the relevant time period, was a Deputy Superintendent at SCI-Forest; and John Wetzel ("Wetzel"), Secretary of the Pennsylvania Department of Corrections ("DOC"). Pending before the Court are a motion for summary judgment [ECF No. 48] and supplemental motion for summary judgment [ECF No. 67] filed by Defendants. For the following reasons, the motions will be granted.

### A.    Relevant Factual History

On June 25, 2013, Plaintiff returned to SCI-Forest following a temporary transfer to SCI-Graterford, where he was incarcerated while testifying against a co-defendant in a criminal case.

---

[1] The parties have consented to having a United States Magistrate Judge exercise jurisdiction over this matter. [ECF Nos. 4, 8].

As per his plea agreement, Plaintiff was eventually to be transferred out of state out of concern for his safety, but in the interim, he was to be housed at SCI-Forest. When Plaintiff returned to SCI-Forest, he met with the Initial Review Committee ("IRC") to determine his cell placement. Plaintiff requested to be placed in a single cell because of his cooperation and was issued an "Other" report, placing him in Administrative Custody ("AC"). Plaintiff also advised the IRC that the Philadelphia District Attorney's Office had a list of inmates from whom he needed to be separated, but the inmates' names were not provided at that time.

At the time, Hidalgo and Dietrich were working in the Restricted Housing Unit ("RHU"). Hidalgo was responsible for determining in which cell to place Plaintiff. Typically, when an inmate arrived in the RHU, Hidalgo would ask him questions about physical or sexual assaults or gang affiliations to determine where to place him. He would also ordinarily check the inmate's "separations" and other information about the inmate and his potential cellmate on DOCNET. In this case, however, Hidalgo has no memory of Plaintiff or the matters alleged in this lawsuit.

According to Plaintiff, when he was taken to the RHU, he reiterated his request to be placed in a single cell because he feared for his safety. He was apparently told, however, that there was not enough room to place him in a single cell. Hidalgo, instead, placed Plaintiff in Cell JA 1010. Once he was taken to his cell, he went inside without incident, though he did continue to complain that he wanted a single cell.

Plaintiff's cellmate was Mustafa McCloud, who had been transferred from SCI-Huntington to SCI-Forest on June 20, 2013. While at SCI-Huntington, McCloud had been in Disciplinary Custody ("DC") after a fight with another inmate and then was placed on AC status pending a separation transfer to SCI-Forest. The report placing McCloud on AC status indicated that "he [was] a danger to others." [Ex. 31, ECF No. 51-7 at 117]. Upon his arrival at SCI-Forest,

McCloud was to be kept on AC status for one week before transitioning into general population.

Although Plaintiff did not realize it when he entered his cell, he and McCloud were from the same neighborhood, and Plaintiff used to "see him around." [Pl.'s Dep. at 15:9, ECF No. 51-2 at 23]. Plaintiff had not seen McCloud for approximately 10 years, though, nor was Plaintiff close to him; they had mutual friends but did not "deal with each other." [Pl.'s Dep. at 15:13, ECF No. 51-2 at 23]

When Plaintiff entered the cell, McCloud "didn't let [him] know that he knew who [Plaintiff] was." [Pl.'s Dep. at 15:20, ECF No. 51-2 at 23]. In the middle of that night, Plaintiff awoke to McCloud punching him and trying to pull him out of his bunk. A scuffle allegedly ensued, with the inmates punching each other and wrestling around the cell. During a lull in the fighting, McCloud asked Plaintiff "you don't know who I am"?  [Pl.'s Dep. at 22:5, ECF No. 51-2 at 30]. When Plaintiff said "no," McCloud "told [him] who he was. And he said he [knew] that [Plaintiff] testified on Saheed, [Plaintiff's] co-defendant, and he said . . . that's why that happened." [Pl.'s Dep. at 22:6-9, ECF No. 51-2 at 30]. Plaintiff testified that he had swelling and bruising from the assault, along with a "busted" lip. But he did not seek any medical attention for his injuries, nor does he have any lingering effects from the injuries. [Pl.'s Dep. at 58:2, ECF No. 51-2 at 66].

The next day, Plaintiff approached Freeman while he was in the yard and told him that he had been assaulted in his cell and that he "wasn't going back in there." [Pl.'s Dep. at 29:17, ECF No. 51-2 at 37]. Freeman remembers that Plaintiff would not return to his cell but does not recall why. According to Plaintiff, Freeman seemed to blow him off and went to get Settnek, who was also on duty in the RHU that day. [Pl.'s Dep. at 30:1-2, ECF No. 51-2 at 38]. When they returned, Plaintiff explained what happened to Settnek, who was initially going to make Plaintiff

go back to a cell with another inmate. Plaintiff refused. At that point, Plaintiff testified, Freeman and Settnek discussed the matter alone and then came back and told Plaintiff that they would put him in a single cell but that "[he] better not run [his] mouth or [Settnek] was going to let everybody know that [Plaintiff] was a rat or a snitch." [Pl.'s Dep. at 31:4-6, ECF No. 51-2 at 39]. Settnek and Freeman deny threatening to call Plaintiff a rat or a snitch.

Thereafter, Plaintiff was placed in a single cell on the B pod, Cell JB 2014. The next day, Plaintiff was seen by the Program Review Committee ("PRC"), which decided to keep Plaintiff in AC in a single cell. He was housed in a single cell until he was transferred from SCI-Forest to SCI-Huntington in September 2013.

Plaintiff claims that after he was placed in Cell JB 2014, other inmates started to harass him by banging on their cell walls and yelling that he was a rat or a snitch. When asked during his deposition whether he was alleging that either Settnek or Freeman told these inmates that he had cooperated against his co-defendant, Plaintiff testified, "I can't say that they told them because I didn't hear them tell me that, but it was widespread of what happened, so it's a possibility they found out on their own." [Pl.'s Dep. at 37:9-11, ECF No. 51-2 at 45]. Plaintiff was then asked, "So you don't have anything specifically that Setnick [sic] or Freeman or any staff person told [the other inmates]? You just don't know one way or the other?" [Pl.'s Dep. at 37:13-15, ECF No. 51-2 at 45]. Plaintiff responded, "Right." [Pl.'s Dep. at 37:16, ECF No. 51-2 at 45].

Plaintiff claims that sometimes he would go days without sleeping because of the banging and yelling. He also alleges that other inmates threw urine or feces at him on about four occasions. [Pl.'s Dep. at 46:1, ECF No. 51-2 at 54]. On two of those occasions, the urine and feces was thrown "at a distance" so it did not "touch [Plaintiff]." [Pl.'s Dep. 47:7, ECF No. 51-2

4

at 55]. Plaintiff testified that, as a result of the alleged incidents, he stopped coming out of his cell.

On July 20, 2013, Plaintiff sent a request slip to then-Deputy Superintendent Overmyer, in which he wrote, in pertinent part:

> To whom it may concern, I am writing because I am currently in the RHU A/C Status (protective custody) due to my recent court testimony because there are many individuals that will make an attempt on my life if allowed including two lifers here. Now I haven't heard from or spoken to anyone since my PRC hearing on 6-27-13 at which time I was told they would be looking into having the separations placed yet not one even took the time to question me in regards to this matter which makes it impossible to work on. Which means I am back here from nothing at all. And for that reason I am asking to either be seen or sent back to [general] population . . . .

[Ex. 12, ECF No. 51-1 at 88]. Overmyer responded on July 23, 2013, explaining, "The separations are being processed between Central Office [and] the D.A. When [SCI-Forest] staff know what is happening, you will be notified." [Id.].

On July 22, 2013, the Philadelphia D.A.'s Office faxed a "Request for Separation" to Lt. Haggerty containing a list of Plaintiff's "separations." E-mails indicate that on that same day, Corrections Classification and Program Manager ("CCPM") William Cole was asked to determine where the inmates on the separations list were housed. Cole, in turn, forwarded the list to Unit Manager Edward Heberling and asked him to investigate. Heberling determined that two of the individuals on the separations list were housed at SCI-Forest and forwarded that information to Deputy Superintendent Eric Tice and Overmyer.

Plaintiff testified that he told Settnek and Riskus about the alleged harassment and asked to be moved to a different cell because of the noise and because every time he left his cell, someone was throwing something at him. [Pl.'s Dep. at 50:20, ECF No. 51-2 at 58]. Moreover, on July 24, 2013, Plaintiff wrote a request slip to "RHU Lieutenant" asking to be moved to a

shower cell on D pod because of the alleged harassment. (This request slip was not answered, so it is not clear whether it was, in fact, sent.). The next day, Plaintiff made the same request to Riskus, complaining that he could not leave his cell because he had "people tryna [sic] throw 'ass and shit' on [him]." [Ex. 12, ECF No. 51-1 at 90]. Riskus responded that he could not authorize the move if Plaintiff did not have a Z-code, which denotes single-cell status, because D pod only contains single cells.

On July 28, 2013, Plaintiff sent a request slip to Cole "to find out what separations were submitted by the D.A.'s office." [Ex. 12, ECF No. 51-1 at 91]. Cole responded, "The DA Office needs to relay that to you." [Id.].

On July 29, 2013, Plaintiff wrote to his counselor, David Perry, asking for a copy of the separations list. [Ex. 12, ECF No. 51-1 at 92]. Perry responded, "No we do not tell you who you have separations from." [Id.].

The following day, Plaintiff wrote a request slip to Ms. Ashbaugh-Tenney, a licensed professional counselor at the prison, complaining that he was "being denied [his] eighth amendment right to be free from cruel and unusual punishment as [he was] the victim of constant verbal and physical abuse and everyone up to Capt. Riskus has been made aware and told me there's nothing they can do about it." [Ex. 12, ECF No. 51-1 at 93]. Plaintiff claimed that he was "barely sleeping due to the constant banging on [his] wall" and that he "had urine thrown on [him] twice and feces thrown at [him]." [Id.]. He asked Ms. Ashbaugh-Tenney to help him get moved to C or D pod and threatened "to start breaking windows" if he did not get moved. [Id.]. Ms. Ashbaugh-Tenney responded that Plaintiff had to work with his unit manager and counselor "for movement [and] Z code." [Id.].

On August 5, 2013, Plaintiff wrote to Perry, telling him that he was wrong that Plaintiff

was "not allowed to know separations entered on [his] behalf as it is not privileged information nor is it a security risk." [Ex. 12, ECF No. 51-1 at 93]. Thus, Plaintiff requested a copy of his separations list. However, Perry again refused to provide it, saying that he was not allowed. [Id.] Instead, Perry told Plaintiff to write to Haggerty because he was handling the separations. [Id.]

On August 15, 2013, Plaintiff was moved to Cell JC 1011, where he remained until he was transferred to SCI-Huntington on September 17, 2013. According to Plaintiff, he did not have any problems with continued harassment after he was transferred to the C pod.

On August 20, 2013, Major Paul Ennis of SCI-Forest sent an e-mail to Tracy Comeaux, a staff member in the DOC's Office of Population Management, explaining that SCI-Forest

> had been provided with [a] list of active PA inmates who [Plaintiff] is to be separated from per the Philly Co. DA. A couple at [SCI-Forest] which would mean he would have to leave [SCI-Forest].
>
> I'm trying to locate the original attachment from the Philly Co. DA right now but the currently active inmates are below. I'm not sure this was every [sic] provided to you by them or us. Could you check and let me know. My main concern is he's grieving because he believes we aren't protecting him even though he's in AC in a single cell. Please let me know what you know. Thanks.

[Ex. 16, ECF No. 61-1 at 4 (under seal)]. The next day, a vote sheet was sent around to various SCI-Forest officials, who approved the separation requests. [Id. at 5]. Plaintiff's separations list on DOCNET was then updated accordingly. [Id. at 6-7].

On September 17, 2013, Plaintiff was transferred to SCI-Huntington, where he was given temporary Z-code status and housed in a single cell. On September 27, 2013, officials at SCI-Huntington approved the Philadelphia DA Office's request for an interstate transfer, and he was transferred out of state.

### B.    Plaintiff's Grievances

Plaintiff filed Grievance 469864 on July 21, 2013, alleging that his Eighth Amendment

rights were being violated because prison administrators refused to take steps to protect him from assaults. In addition, he alleged that SCI-Forest officials had "done nothing but ignore [his] requests for separations." [Ex. 10, ECF No. 51-1 at 72]. Overmyer was the only Defendant named in this grievance. On August 19, 2013, the grievance was denied by Capt. Hacherl on the basis that Plaintiff's unit team had updated him as to the status of his separation requests. It was also noted that, on July 22, 2012, SCI-Forest received a document from the Philadelphia DA's Office on behalf of Plaintiff requesting that Plaintiff be separated from certain identified inmates. Hacherl, moreover, found that SCI-Forest had taken reasonable efforts to ensure Plaintiff's safety by placing him in AC. Plaintiff did not appeal the denial of Grievance 469864.

On July 25, 2013, Plaintiff filed Grievance 470926, in which he alleged that he had been assaulted in his cell on June 25, 2013. [Ex. 11, ECF No. 51-1 at 77-78]. He also described how he informed Freeman and Settnek about the assault and how they threatened to label him a "snitch." Aside from Freeman and Settnek, no other CO is named in this grievance. As relief, Plaintiff requested an "adjustment be made to the administrative custody procedures. So that protective custody inmates are separated and only housed with protective custody inmates." [Id. at 78]. He also requested Z-code status. On August 20, 2013, Riskus denied Grievance 470926 because he could not substantiate Plaintiff's claims and there was no indication that any prison policy or procedure had been violated. Plaintiff appealed the denial of Grievance 470926 to the facility manager, who upheld the initial denial. In January 2014, Plaintiff attempted to appeal to the final level of review, but his appeal was rejected as untimely since it was to have been filed by November 6, 2013. Plaintiff claimed that he had not received the facility manager's appeal response until December 20, 2013, which made him miss the deadline, but the review officer rejected this contention for lack of proof.

On August 11, 2013, Plaintiff filed Grievance 472637, alleging, in part, as follows:

In the past 47 days, I have had urine thrown me twice, feces thrown at me and my cell and individuals banging on my wall night and day to the point I sometimes go days without sleep. And everyone from the c/os to the superintendent either has personal knowledge or I have written informing them asking nothing more than to be moved and no one will help. The Sgt's, Lt's and Captain Riskus all refused to intervene as if this inhumane treatment is a part of my sentence. I've written PRC and the deputies, my counselor (Mr. Perry), the psychologist and Superintendent asking and begging them to just see what they can do to help me get moved and only Ms. Temey even had the decency to respond.

This is the exact reason its [sic] so much chaos and so many cell extractions because Captain Riskus refuses to do even an inkling or iota of his job and those above him allow him to do it . . . .

[Ex. 13, ECF No. 51-1 at 96-97]. Plaintiff requested to be moved to a single shower cell on C pod to limit further harassment and to have Riskus reprimanded. On September 5, Tice issued a response upholding in part and denying in part Plaintiff's grievance. Tice also directed that Plaintiff be moved to another pod in the RHU "to ease [the] burden of feeling targeted." [Id. at 98]. By that time, however, Plaintiff had already been moved to a cell in C Pod. The response to Grievance 472637 was upheld on both levels of appeal.

On September 12, 2013, Plaintiff filed Grievance 477290, complaining that he had not been allowed to see a copy of the separations list. He also provided the names of individuals from whom he needed to be separated. In response, Plaintiff was given the names of the individuals on the separations list forwarded by the DA's Office.

### C.     Procedural History

Plaintiff instituted this action on February 28, 2014, by filing a *pro se* complaint pursuant to 42 U.S.C. § 1983, against Riskus, Settnek, Freeman, Overmyer, Wetzel, and "John Doe." On August 29, 2014, Defendants filed a partial motion to dismiss [ECF No. 14] with respect to the claims against Wetzel and the claims against all named Defendants to the extent they arose from

the alleged conduct of the John Doe Defendant and other unnamed guards. By Opinion and Order dated March 24, 2015, the Court granted the motion in part and denied it in part, dismissing all claims against Wetzel, except for Plaintiff's claim alleging a failure to write into policy procedures to protect the safety of protective custody inmates; all claims against Riskus, Settnek, Freeman, and Overmyer to the extent they related to the conduct of John Doe, the unnamed guards, and Wetzel; and all claims against John Doe. [ECF No. 20 at 10].

On May 11, 2015, Plaintiff sent the Court a letter, asking to reinstate his claim against John Doe. [ECF No. 25]. The Court construed Plaintiff's request as a motion to appoint counsel, and directed the Clerk of Courts to request an attorney to consider representing Plaintiff in this matter. [ECF No. 28]. On August 31, 2015, Plaintiff's current counsel accepted the request to represent him and entered their appearances on his behalf. [ECF Nos. 32-34].

Following the close of discovery, Defendants filed a motion for summary judgment, with a concise statement of material facts ("CSMF"), appendix, and a brief in support. [ECF Nos. 48-51]. That same day, Plaintiff, through counsel, sought leave to file an amended complaint to clarify his Eighth Amendment failure to protect claim against Defendants; to add Hidalgo as a party, as he had been identified during discovery as the John Doe Defendant; and to add a "claim" for punitive damages. [ECF No. 53 at 3]. On January 6, 2017, the Court held a telephonic hearing, during which it granted Plaintiff's motion for leave, while permitting Defendant to supplement their summary judgment motion to address the new claim against Hidalgo. [ECF No. 62].

Plaintiff filed his amended complaint later that day. [ECF No. 64]. In count I, Plaintiff alleges an Eighth Amendment failure to protect claim against Hidalgo. In count II, he alleges a failure to protect claim against Riskus, Settnek, Freeman, and Overmyer. More specifically, he

alleges that "[b]y failing to protect [him] from McCloud's assault and the subsequent harassment by other inmates, and by failing to timely process [his] separations, Defendants deprived [him] of his Eighth Amendment right . . . ." [Id. ¶ 61]. In count III, Plaintiff asserts a claim against Wetzel for "fail[ing] to ensure that there were policies in place to ensure that Plaintiff, an inmate granted protective custody, was properly protected from assault by another inmate with a history of violent behavior" and by "fail[ing] to have in place procedures that would expedite the processing of separations lists so that separations were implemented upon a prisoner's arrival at SCI-Forest." [Id. ¶¶ 66-67].

Defendants filed their supplemental motion for summary judgment [ECF No. 67], with a brief in support, on January 27, 2017, in which they address the claim against Hidalgo as well as what they label Plaintiff's "[n]ew [c]laim [r]egarding [the] [s]eparation [p]olicy." [ECF No. 68 at 7]. Plaintiff filed a brief in opposition to Defendants' motion and supplemental motion, along with a response to Defendants' CSMF, on February 27, 2017. [ECF Nos. 69-70]. Having been fully briefed, the motion and supplemental motion are ripe for disposition.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed. R. Civ. P. 56(C). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247–249.

## III.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language is mandatory. Ross v. Blake, 136 S. Ct. 1850, 1856 (2016). Moreover, the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90–91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Id. at 93 (quoting Porter, 534 U.S. at 525). Courts have concluded that inmates who fail to fully or timely complete the prison grievance process are barred from subsequently litigating claims in federal courts. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

### 1.    Hidalgo

Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect

to his claim against Hidalgo. Plaintiff does not dispute that Hidalgo was not identified in his grievances; however, he argues that SCI-Forest excused his failure to identify Hidalgo during the grievance process.

The PLRA, itself, does not require a prisoner to have named each individual whom he sues in a prior grievance. Jones v. Bock, 549 U.S. 199, 218 (2007) (concluding that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances"). "However, prisoners are required to complete the administrative review process in accordance with rules that are defined by the prison grievance process" – including the rules relating to whom must be identified in the grievance. Byrd v. Shannon, 715 F.3d 117, 127 (3d Cir. 2013) (citing Jones, 549 U.S. at 218). If a prisoner fails to properly exhaust the available administrative remedies, he cannot bring suit on such claim(s) in federal court. Goins v. Longstreet, 2013 WL 869644, at *5 (W.D. Pa. Feb. 13, 2013) (citing Oliver v. Beard, 2011 WL 4565787, at *7 (M.D. Pa. Sept. 29, 2011); Spruill v. Gillis, 372 F.3d 218, 227–32 (3d Cir. 2004).

The Pennsylvania Department of Corrections ("DOC") has implemented an official Inmate Grievance System, which is governed by Administrative Directive 804 ("DC–ADM 804").[2] The relevant provision of the prison grievance process is DC-ADM 804 § 1.A.11, which, at the time Plaintiff filed his grievances, stated, in pertinent part, "The inmate shall identify individuals directly involved in the event(s)." The only grievance that relates to Plaintiff's initial cell placement upon his return to SCI-Forest is Grievance 470926. This grievance mentions Freeman and Settnek but, as Plaintiff concedes, it does not mention Hidalgo. By failing to

---

[2]

Although neither Plaintiff nor Defendants have provided the Court with a copy of the DC-ADM 804, "the Court may take judicial notice that the applicable grievance procedure was the DC-ADM 804 and judicial notice that generally inmates who are in custody of the DOC receive a copy of the Inmate Handbook which contains portions of the DOC's grievance policy, DC-ADM-804." Mayon v. Capozza, 2017 WL 476790, at *7 (W.D. Pa. Feb. 6, 2017) (citations omitted).

identify Hidalgo either by name or title, Plaintiff procedurally defaulted his claim against him. See Spruill, 372 F.3d at 227-32.

Relying on Spruill, Plaintiff argues that "[t]he Third Circuit has held that the prison can excuse an inmate's failure to specifically name individuals by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance." (ECF No 69 at 6). True as that may be, there is no evidence that Plaintiff's failure to identify Hidalgo was excused. In Spruill, for example, the Third Circuit held that the prison's grievance process excused the plaintiff's procedural default because the grievance officer's "'Initial Review Response' (the first level determination under the Grievance Policy System) identified [the defendant] by name." 372 F.3d at 234. By contrast, Riskus, who responded to Grievance 470926, did not identify Hidalgo, by name or otherwise, in his response. Rather, the review focused solely on the conduct of Freeman and Settnek. Therefore, Plaintiff's procedural default was not excused, and Hidalgo is entitled to summary judgment due to Plaintiff's failure to exhaust administrative remedies as to him.[3]

## 2. Overmyer

Plaintiff alleges that Overmyer demonstrated deliberate indifference by ignoring his requests for help when he complained about the alleged harassment. According to Defendants, Plaintiff failed to exhaust his administrative remedies with respect to this claim because "[h]e only filed one grievance, Grievance 472637, about the alleged harassment he faced" and that

---

[3]

In addition, although not specifically raised by Defendants, it appears that Plaintiff did not exhaust his administrative remedies with respect to Grievance 470926. As already noted, exhaustion must be "proper." Woodford, 548 U.S. at 90 (emphasis in original) (explaining that a prisoner must "us[e] all steps that the agency holds out, and [do] so *properly* (so that the agency addresses the issues on the merits)") Even though Plaintiff attempted to appeal the denial of Grievance 470926 to the third level of review, his effort was rejected as untimely. Thus, he did not properly exhaust his administrative remedies. See Spearman v. Morris, 643 F. App'x 82, 85 (3d Cir. 2016) ("Because Spearman never perfected his appeal for final review according to applicable procedures, he has failed to exhaust his administrative remedies."). However, because failure to exhaust is an affirmative defense and Defendants have not specifically raised this argument, the Court will not dismiss Plaintiff's claim on this basis.

grievance "in no way can be construed to be asserted against Supt. Overmyer." [ECF No. 49 at 15]. The Court disagrees.

In Grievance 472637, which was unsuccessfully appealed to both levels of review, Plaintiff wrote that "everyone from the c/os to the superintendent either has personal knowledge or I have written informing them asking nothing more than to be moved and no one will help." [Ex. 13, ECF No. 51-1 at 96]. He also wrote that he had "written PRC and the deputies, [his] counselor (Mr. Perry), the psychologist and Superintendent asking and begging them" for help, but to no avail. [Id. at 97]. Even though Overmyer was not identified in this grievance by name, Plaintiff did make reference to "deputies," and at the time, Overmyer was a deputy superintendent. This was sufficient to "put[] the prison officials on notice of the persons claimed to be guilty of wrongdoing[.]" Brown v. Maxa, 2013 WL 1150728, at *7 (W.D. Pa. Mar. 19, 2013) (noting that a grievance may identify a prison official by "name, description, or title" and thereby satisfy the exhaustion requirement).

### 3. Claim about Plaintiff's Separations Requests

Plaintiff alleges that Wetzel "failed to implement a policy to deal with the processing of inmate separations." [ECF No. 69 at 36]. He further alleges in the amended complaint that other Defendants "failed to diligently process the list of 'separations' and [he] was housed for nearly two months at SCI-Forest without the proper separations in place." [ECF No. 64 ¶¶ 55, 57]. Defendants contend that Plaintiff did not exhaust administrative remedies with respect to this claim because "Plaintiff only brought this issue up in one grievance, Grievance 469864, which was not exhausted because it was not appealed to final review." [ECF No. 68 at 8].

Defendants are correct that "[a]n inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully

exhaust an issue." Barclay v. Sokol, 2015 WL 5012759, at *4 (W.D. Pa. Aug. 18, 2015). For his

part, Plaintiff does not dispute that he did not appeal the denial of Grievance 469864. But he says

that he did not have to. "[N]o administrative remedies were actually available to him," he claims,

"because he was never made aware of the extent of the DOC's failure to diligently obtain and

process his separations." [ECF No. 69 at 39]. Thus, he says, "it [would be] inequitable and

unreasonable to require [him] to exhaust administrative remedies when the information required

to pursue those remedies (i.e., the failure of the DOC to obtain, process, or implement his

separations information) was being intentionally withheld from him." [Id.] Plaintiff also

contends that he "attempted to exhaust administrative remedies with regard to this claim, but was

prevented from doing so solely by the DOC." [Id. at 40].

　　To begin with, Plaintiff's appeal to equitable considerations must be rejected out of hand.

Since it is framed in mandatory terms, "the PLRA prevent[s] a court from deciding that

exhaustion would be unjust or inappropriate in a given case." Ross, 136 S. Ct. at 1858. Instead,

the only time that a Plaintiff need not pursue administrative remedies is when those remedies are

not "available" to him. Id. at 1858.

　　While Plaintiff contends that this exception to the exhaustion requirement is met, the

Court reaches the opposite conclusion. A prison's administrative remedies are considered

"available" if they are "'capable of use' to obtain 'some relief for the action complained of.'" Id.

at 1859 (quoting Booth, 532 U.S. at 738). The Supreme Court has identified "three kinds of

circumstances in which an administrative remedy, although officially on the books, is not

capable of use to obtain relief" – in other words, is unavailable. Id. First, an administrative

procedure "is unavailable when (despite what regulations or guidance materials may promise) it

operates as a simple dead end – with officers unable or consistently unwilling to provide any

relief to aggrieved inmates." Id. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id. Third, an administrative procedure may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" – for example, by creating "blind alleys and quagmires" to 'trip[] up all but the most skillful prisoners.'" Id. at 1860 (quoting Woodford, 548 U.S. at 102).

The facts here do not fall into any of those categories. Plaintiff's first argument – that the grievance process was not available because "he was never made aware of the extent of the DOC's failure to diligently obtain and process his separations" – is a nonstarter. The Court fails to see how the Defendants' decision not to provide Plaintiff with information about his separation requests prevented him from appealing Grievance 469864. He had enough information to file the grievance, so it is inexplicable why he did not also have enough information to file an appeal. If anything, each of the alleged failures described by Plaintiff gave him reason to file additional grievances. But in no way did they did not foreclose his ability to appeal the initial denial of Grievance 469864. The same is true for Plaintiff's second argument – that he was thwarted from using the grievance process because of the unit manager's alleged delay in responding to his appeal of an entirely separate grievance, Grievance 470926. While such a delay may have affected Plaintiff's ability to timely appeal Grievance 470926 to the final level of review, there is no basis for concluding that it affected his ability to appeal Grievance 469864, which is the grievance that actually dealt with the separations issue. Accordingly, the Court concludes that Plaintiff failed to establish that the prison grievance system was unavailable to him with regard to Grievance 469864. Since he did not appeal the denial of that grievance

through all three levels of review, he failed to exhaust his administrative remedies, and summary judgment must be granted in Defendants favor as to this claim.

### B.    Eighth Amendment Claims against Settnek, Freeman, and Overmyer

To state a claim under the Eighth Amendment, a prisoner must show that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "'Deliberate indifference' in this context is a subjective standard: 'the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.'" Id. (quoting Beers–Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)). While it is not enough to show that the official "should have known of the risk," a plaintiff can prove "an official's actual knowledge of a substantial risk to his safety 'in the usual ways, including inference from circumstantial evidence.'" Id. (quoting Farmer, 511 U.S. at 834). "In other words, 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Id. (quoting Farmer, 511 U.S. at 834). After a prisoner makes a *prima facie* showing of deliberate indifference, an official can rebut it "either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." Beers–Capitol, 256 F.3d at133.

### 1.    Claim against Settnek and Freeman for Labelling Plaintiff a "Snitch"

Plaintiff claims that Settnek and Freeman exhibited deliberate indifference to his safety by labeling him a snitch or a rat. Defendants move for summary judgment as to this claim,

arguing that there is no evidence that either Settnek or Freeman actually carried out the alleged threat to label him a snitch or a rat. Plaintiff, however, argues that there is a genuine issue of fact as to whether they did so. In support of that assertion, Plaintiff points to the fact that after he "was placed in a single cell, other inmates began banging on the walls of his prison cell, calling him a 'snitch.'" [ECF No. 70 at 23].

Courts in the Third Circuit have recognized that "'[l]abeling an inmate as a snitch may give rise to an Eighth Amendment violation if the prison official acted with deliberate indifference to a substantial risk of serious harm to the inmate.'" Brown v. Shrader, 2017 WL 1022577, at *9 (W.D. Pa. Mar. 16, 2017) (quoting Tabb v. Hannah, 2012 WL 3113856, at *6 (M.D. Pa. July 30, 2012)); see also Robinson v. Danberg, 2016 WL 7364148, at *6 (3d Cir. Dec. 19, 2016) ("[C]alling an inmate a snitch may have dire consequences when overheard by other inmates."). So, too, have a number of courts of appeals. See, e.g., Irving v. Dormire, 519 F.3d 441, 451 (8th Cir. 2008) ("[T]o falsely label an inmate a snitch is to unreasonably subject that inmate to the threat of a substantial risk of serious harm at the hands of his fellow inmates."); Benefield v. McDowall, 241 F.3d 1267, 1271–72 (10th Cir. 2001) ([L]abeling an inmate a snitch satisfies the Farmer standard, and constitutes deliberate indifference to the safety of that inmate."). Under this line of cases, "an inmate need not wait until an attack occurs to obtain relief." Horan v. Collins, 2016 WL 5030468, at *17 (M.D. Pa. Aug. 8, 2016) (citing Benefield, 241 F.3d at 1270-72). Rather, "'the focus must be, not the extent of the physical injuries sustained in the attack, but rather the existence of a substantial risk of serious harm.'" Id. (quoting Pearson v. Vaughn, 102 F. Supp. 2d 282, 290 (E.D. Pa. 2000)).

Upon review of the record, the Court concludes that Plaintiff has not adduced sufficient evidence to create a genuine issue of fact as to whether he was labelled a snitch by Settnek and

Freeman and, in turn, whether he faced a substantial risk of harm. In fact, there is no evidence to

support Plaintiff's contention. As Plaintiff, himself, testified during his deposition:

> A. I mean, I can't say that [Settnek and Freeman] told [the other inmates that he
> was a snitch or a rat] because I didn't hear them tell them that, but it was
> widespread of what happened, so it's a possibility they found out on their own.

> Q. So you don't have anything specifically that Setnick [sic] or Freeman or any
> staff person told [the other inmates]? You just don't know one way or the other?

> A. Right.

[Pl.'s Dep. at 37:9-16, ECF No. 51-2 at 45].

While Plaintiff invites the Court to infer that Settnek and Freeman carried out their

alleged threat because other inmates banged on his cell walls and called him a snitch, this is not a

reasonable inference to draw from the evidence of record. It is pure speculation. Absent any

evidence that Settneck or Freeman labelled Plaintiff a snitch or a rat (e.g., testimony or affidavits

from other inmates or Plaintiff himself, for that matter), Plaintiff cannot succeed on this claim

since it is well established that verbal threats and harassment, in and of themselves, do "not give

rise to a constitutional violation." Durham v. Vekios, 2010 WL 5479633, at *5 (D.N.J. Dec. 22,

2010) (collecting cases). Accordingly, Settnek and Freeman are entitled to summary judgment.

### 2. Claim against Settnek, Freeman, and Overmyer

Plaintiff claims that the Defendants "failed to ensure that [he] was not subjected to

harassment by other prisoners as a result of his being labeled a 'snitch.'" [ECF No. 64 ¶ 55].

Defendants argue that Plaintiff failed to establish that he was subjected to a substantial risk of

harm or that any of these Defendants subjectively believed that Plaintiff faced such a risk.

The Court agrees with Defendants that Plaintiff has not established the two requisite

elements to impose liability on these Defendants under the Eighth Amendment. "To meet the

objective criteria of an Eighth Amendment claim, a plaintiff must show that the risk of injury

from the conditions to which he was exposed was 'so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.'" Whitney v. Wetzel, 649 F. App'x 123, 127 (3d Cir. 2016) (quoting Helling v. McKinney, 509 U.S. 25, 36 (1993)). There is no evidence that the noise in the RHU from other inmates allegedly banging on his cell wall "was so excessive and pervasive that it posed a serious risk of injury to him." Id. At most, the noise was "'irritating,' which 'cannot fairly be said to inflict cruel and unusual punishment'" Id. (quoting Peterkin v. Jeffes, 855 F.2d 1021, 1027 (3d Cir. 1988)). And while Plaintiff claims that he had trouble sleeping, that contention is belied by the record of his visits with his counselor and the prison's mental health staff, which did not note any deterioration in Plaintiff's condition or mental state as a result of a lack of sleep.

Plaintiff, moreover, testified about two occasions when urine and/or feces was thrown at him and actually made contact. Courts in the Third Circuit have considered similar allegations insufficient to state a claim under the Eighth Amendment. See, e.g., Hughes v. Barr, 2015 WL 3710615, at *8 (M.D. Pa. June 12, 2015) (citing Dockery v. Legget, 2012 WL 2872554, *20 (W.D. Pa. 2012), adopted by, 2012 WL 2872106, aff'd sub nom., Dockery v. Beard, 509 F. App'x 107 (3d Cir. 2013)) ("[A] single incident of an inmate throwing feces at [another inmate] is insufficient to state an Eighth Amendment claim."). As another court has explained, "such incidents unfortunately are a regular part of prison life." Neason v. Bienko, 2012 WL 4760891, at *8 (W.D.N.Y. Oct. 5, 2012). Thus, Plaintiff has not established the objective component of his Eighth Amendment claim.

Nor has Plaintiff adduced evidence that Settnek, Riskus, or Overmyer was deliberately indifferent. As Defendants argue, there is no evidence that Overmyer was ever informed that Plaintiff was being harassed because he was perceived to be a "snitch." In addition, although

Plaintiff claims that he told Settnek and Riskus about what was occurring, there is no evidence that their response was not reasonable, let alone deliberately indifferent. Accordingly, these Defendants are entitled to summary judgment as to this claim.

### C.      Eighth Amendment Claim against Wetzel

Plaintiff alleges that the DOC's AC Policy creates an unreasonable risk of harm by allowing inmates who are in AC because they have cooperated in the prosecution of criminal cases to be housed with inmates who are in AC for other reasons.[4] Wetzel argues that he is entitled to summary judgment as to this claim,[5] analyzing it under the framework set forth in Turner v. Safley, 482 U.S. 78 (1987). In the Court's view, however, this claim must be analyzed under the Eighth Amendment "deliberate indifference" standard. See Johnson v. California, 543 U.S. 499, 511 (2005) (explaining that Turner has not been used "to evaluate Eighth Amendment claims of cruel and unusual punishment in prison[;]" instead, such claims are analyzed "under the 'deliberate indifference' standard").

As the Third Circuit Court of Appeals has explained:

---

[4]

Plaintiff argues throughout his brief that the risk associated with being labeled a "snitch" is widely known, and, thus, the DOC's failure to adopt a policy providing "for inmates who are labeled as 'snitches' . . . to be housed alone or with other similarly-situated, non-violent inmates" amounts to deliberate indifference. [ECF No. 69 at 29]. The problem with the way in which Plaintiff has framed this issue is that there is no evidence that Plaintiff had been labeled a "snitch" by fellow inmates or any officials at SCI-Forest at the time he returned to SCI-Forest from SCI-Graterford. To be sure, he was placed on AC status for his own safety because he had cooperated against a co-defendant. But there is no evidence that the "snitch" label was attached to Plaintiff until *after* he had already been placed in a single cell. More to the point, there is no evidence that any of the relevant decisionmakers knew that McCloud knew who Plaintiff was or perceived him to be a "snitch." Thus, the relevant question is whether the risk of placing an inmate who was in AC because he had testified for the prosecution in a criminal case in a cell with an inmate on AC for another reasons posed an obviously unreasonable risk. For the reasons explained below, the Court concludes that there is no evidence that it did.

[5]

Plaintiff first raised the issue with respect to this policy in Grievance 470926. [Ex. 11, ECF No. 51-1 at 78]. In particular, he requested Plaintiff requested "an adjustment be made to the administrative custody procedures. So that protective custody inmates are separated and only housed with protective custody inmates." [Id. at 78]. As noted elsewhere in this Opinion, Plaintiff did not file a timely appeal of the denial of Grievance 470926 to the final level of review. Thus, this claim has likely not been exhausted. Defendants, however, have not raised the defense of failure to exhaust as to this claim. Therefore, rather than raising the issue *sua sponte*, the Court will, out of an abundance of caution, address this claim on its merits.

> To hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice.

Beers-Capitol, 256 F.3d at 134 (citing Sample, 885 F.2d at 1118). "One way – perhaps the easiest way – a plaintiff can make out a supervisor liability claim is by showing that 'the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries.'" Id. (quoting Sample, 885 F.2d at 1118). "But that is not the only way to make out such a claim, as 'there are situations in which the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it.'" Id. (quoting Sample, 885 F.2d at 1118).

Here, Plaintiff has not established that Wetzel was subjectively aware of the risk created by the allegedly inadequate policy. There is no evidence of a pattern of prior assaults against inmates in AC for their own protection by inmates in AC for other reasons. Additionally, the Court cannot infer that the risk of harm to inmates in Plaintiff's position was so obvious under these circumstances that Wetzel should be charged with awareness of it. Cf. Coleman v. Wetzel, 2015 WL 10381754, at *7 (M.D. Pa. Dec. 28, 2015) (concluding that the alleged risk posed by DOC's policy of assigning non-violent inmates to cells with violent inmates was no so obvious "as to support a finding that Defendants were deliberately indifferent to that risk"). While the DOC's policy permits individuals on AC status for different reasons to be housed together, an individualized assessment is also made in every case to determine whether there is a risk of housing two inmates together. With those other mechanisms in place, it cannot be said that the "plainly obvious consequence" of the DOC's policy would be that one of inmates on AC status

for their own protection would be assaulted by inmates on AC status for other reasons.

Therefore, the motion for summary judgment will be granted as to the claim against Wetzel.

An appropriate Order follows.


/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge